UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

-v-                                                                CASE NO.: 5:19-CR-253 (DNH)

MARK SWEENEY, JR.

_____

# SENTENCING MEMORANDUM

DATED:      October 17, 2019              Respectfully submitted,

                                          LISA A. PEEBLES
                                          Federal Public Defender
                                          Office of the Federal Public Defender


                                          By: Gabrielle DiBella
                                          Assistant Federal Public Defender
                                          Bar Roll No.: 700576
                                          Office of the Federal Public Defender
                                          4 Clinton Square, 3rd Floor
                                          Syracuse, New York 13203

## PRELIMINARY STATEMENT

On July 11, 2019, Mark Sweeney, Jr. ("Mr. Sweeney") pled guilty to one count of Threatening Federal Employees in violation of 18 U.S.C. § 115(a)(1)(B). Sentencing is currently scheduled for November 7, 2019 in Utica, New York. The United States Probation Department has prepared a Presentence Investigative Report (*hereinafter* "PSR") on September 23, 2019, in anticipation of sentencing. The PSR sets forth a total offense level of 10 (after acceptance of responsibility) and a Criminal History Category of I. The defense concurs with the report's calculation of total offense level and the Criminal History Category.

## I.      FACTUAL BACKGROUND

"Someone needs to wake up America to what is going on in our Veteran's hospitals," an exasperated Mark Sweeney tells the Veteran's Affairs Crisis Line in February of 2019. When pressed by the dispatcher about what it is that he wants, he explains, "what I want is to be treated like a human being, and get treatment and help." While Mark Sweeney's phone call crossed the line from frustration to criminal, he is certainly not alone in being disheartened by the level of care provided to veterans in the United States by the VA. A cursory review of the Syracuse VA Facebook page reflects several others who voice their concerns over the level of care they or their loved ones have failed to receive there. These concerns include one writer's father going there for medical treatment, describing it as "the worst place in the world for anyone to go to…." Another writes, "worst place ever. I am ashamed this is where veterans are expected to get help." Another man still comments on that post, "I had a similar experience when one of the officers when I went to the emergency room in for me that instead of coming up there again I should just kill myself…"

Mr. Sweeney has suffered various forms of abuse throughout most of his life.  As a child, teenager, and  oung adult, he suffered physical, sexual, and emotional abuse. He was raised in a very dysfunctional household, and suffered physical abuse at the hands of his father. His father was rarely home, but when he was, things did not go so well for Mr. Sweeney. While in the 10th grade, a teacher sexually molested him. When he joined the military, he suffered emotional abuse because of his sexual orientation. Throughout his life Mr. Sweeney has been the victim of physical, sexual, and emotional abuse. He has led a life that most people cannot imagine.

In a series of tragic events, Mr. Sweeney lost both of his parents before his 25th birthday. His two siblings are estranged from him, and have not been in contact with him for quite some time. His younger brother Michael, whom he had to raise after his parents passed, lives in Syracuse but has only caused trouble for Mr. Sweeney. Mr. Sweeney last heard from Michael about 12 years ago when his brother was drinking heavily and only wanted money from him. Mr. Sweeney indicates that his sister Karen turned against him after their father died and has never met her children, nor been invited to her house. He lives a mostly solitary life, keeping to himself.

Mr. Sweeney served his country proudly until he was honorably discharged after falling 38 feet while in "jump school."  VA records reflect that Mr. Sweeney was prescribed morphine by the VA for a period of 15 years. After having taken morphine for 15 years, it was understandably difficult for Mr. Sweeney to handle the news that he was no longer going to receive this medicine. In addition to his frustrations from the VA's prescribing practices, Mr. Sweeney was also facing another health crisis. Mr. Sweeney has none of his original teeth. Instead, he paid $54,000 for dental implants. One of the implants failed and he was under the impression that he had to replace all the implants for which he had paid thousands of dollars.

Specifically, he was under the impression he had to get replacements because the dentist wanted to make money off of him. As a result, he has no teeth at all, and only has the posts from the implants. Mr. Sweeney continues to have difficulties with self-esteem and nutrition related to his dental problems. Mr. Sweeney has been depressed and somewhat reclusive to home, with few social contacts. He attributes this anxiety and depression to his chronic dental issues.

During his call to the Veteran's Crisis Line in February 2019, Mr. Sweeney voiced his frustrations with the VA. It is fair to say that Mr. Sweeney completely lost control during this phone call, with several of his statements consisting of threats which certainly were criminal. He did threaten to kill people at the VA. He did claim to have a plan and a way to carry it out. What the dispatcher on the other end didn't know, was that Mr. Sweeney actually had no way to carry out this threat. He owns no weapons, and no firearms were located at his house. He did describe in detail to the dispatcher that he was angry and that "they're all gonna pay."

During this rambling call, spotted with moments of silence, Mr. Sweeney begins to discuss his dental issues with the dispatcher. He tells the dispatcher that he has all of his teeth "at home in bags," and that he "went from the guy with fancy teeth to no teeth." He explains to the dispatcher that when his implants were taken out, the dentist told him not to expect too much. He continues to ask the dispatcher what she would have done if a dentist had told her that. While this conversation contained threats that certainly were criminal, it also contained a markedly human aspect of a veteran deeply in distress with no family or friends to turn to.

## II.    ARGUMENT

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing Guidelines are advisory rather than mandatory.  Therefore, in determining a sentence,

a court must equally consider the Guideline calculations, the unique characteristics of the

defendant, and the other statutory concerns listed in 18 U.S.C. § 3553(a), specifically:

> (1)  The nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)  The need for the sentence imposed
>> (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B)  To afford adequate deterrence to criminal conduct;
>> (C)  To protect the public from further crimes of the defendant; and
>> (D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Here, each of those factors weigh in favor of imposing a sentence of time served.

**A.  A sentence of time-served is a just punishment and serves to deter others**

Mr. Sweeney's conduct – while unlawful, morally wrong, and troubling – was the

product of overwhelming frustration directed at the level of care received at the VA Hospital, in

light of the unbearable dental pain he has continuously suffered. Mr. Sweeney has accepted

responsibility for his actions, has expressed remorse for his actions, and has had eight months to

truly evaluate his behavior and the need for change. It has not been an easy eight months.

Because of his age and health issues, he is an easy target for the younger, much more savvy

inmates. Because he has never been incarcerated before, the eight months he has done are

significantly more eye-opening than they would be to someone who has been incarcerated

before. Consideration of the significance of prison time for a first-time offender is consistent

with 18 U.S.C. § 3353's directive that the sentence reflect the need for just punishment and

adequate deterrence. *See e.g., United States v. Baker*, 445 F.3d 987 (7th Cir. 2006) (affirming

below-guideline sentence in child porn distribution case because the district court's finding that a

prison term would mean more to the defendant than to other defendants who have been

previously imprisoned was significant.); *United States v. McGee*, 479 F.Supp.2d 910 (E.D.Wisc.

2007) (below-guideline sentence in heroin distribution case because the defendant had never

been to prison, and "generally a lesser period of imprisonment is required to deter a defendant

not previously subject to lengthy incarceration than is necessary to deter a defendant who has

already served some serious time yet continues to reoffend.").

A sentence of time-served would also sufficiently deter criminal conduct by others.

Studies of the deterrent effect of prison sentences have found that it is the prosecution of crime,

rather than the sentence imposed, that has the strongest deterrent effect. In one of the best studies

of specific deterrence, which involved federal white collar offenders in the pre-guideline era, no

difference in deterrence was found between probation and imprisonment. Another study by the

Institute of Criminology at Cambridge University examined the effects of changes to both the

*certainty* and the *severity* of punishment. While significant correlations were found between the

certainty of punishment and crime rates, the "correlations between sentence severity and crime

rates . . . were not sufficient to achieve statistical significance." *See* David Weisburd et. al.,

*Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology

587 (1995).

### B.  Mr. Sweeney now has the stigma of a felony conviction

By virtue of this conviction, Mr. Sweeney is now a felon. The consequences of a felony

conviction are many and far-reaching. He can no longer vote, possess a firearm, or sit on a jury.

Still further, he faces the stigma of a felony conviction. Convict status "serves as a perpetual

badge of infamy, even serving to impugn reputation beyond the grave." Wayne A. Logan,

*Informal Collateral Consequences*, 88 Wash. Law Review 1103, 1107 (2013). Even after serving

a formal sentence, Mr. Peterson's debt to society will never be viewed as paid. He will endure

"new forms of punishment capable of generating more anger, more shame, and the scars of

permanent social stigma." ERNEST DRUCKER, A PLAGUE OF PRISONS 130 (2011). He will

deal with the permanent and pervasive consequences of a felony conviction for the rest of his

life.

### C.  Mr. Sweeney is less of a risk to recidivate

The likelihood that a defendant will engage in future criminal conduct is a "central factor

that district courts must assess when imposing sentence." *Pepper v. United States*, 131 S.Ct.

1229, 1242 (2011). A below-guideline sentence may be appropriate where a defendant has a low

risk of recidivism. *See, e.g., United States v. D.M*., 042 F.Supp. 2d 327 (E.D.N.Y. May 1, 2013)

(where young child porn defendant facing guidelines of 78-97 months, a sentence of probation

was appropriate in part because there was little likelihood he would engage in future criminal

conduct); *United States v. Cabrera*, 567 F.Supp.2d 271 (D.Mass. 2008) (defendant convicted of

possession with intent to distribute facing guideline sentence of 70-78 months, court imposed

sentence of 24 months in part because recidivism concerns "compel a sentence still

substantially" lower).

Mr. Sweeney celebrated his 61st birthday in the Delaware County Correctional Facility.

Studies have shown that "[r]ecidivism rates decline relatively consistently as age increases." U.S.

SENTENCING COMMISSION, MEASURING RECIDIVISM: THE CRIMINAL HISTORY

COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 12 (2004), *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2004/200405_Recidivism_Criminal_History.pdf. It has long been acknowledged

that the argument that "elderly offenders pose so low a risk to the public that long or otherwise

harsh sentences have little to no utilitarian benefit." Dawn Miller, *Sentencing Elderly Criminal*

*Offenders*, 7 Nat'l Acad. Elder L. Att'ys. J. 221, 232 (2011). Research has made clear that the

older the age of the defendant, the lower the rearrest rate. *See* U.S. SENTENCING COMMISSION,

RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW (March

2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2016/recidivism_overview.pdf.  Mr. Sweeney's statistically

low likelihood of being re-arrested warrants a below-guideline variance in his case.

### D.  Mr. Sweeney's age and health issues would make further incarceration difficult

A defendant's age may be relevant in determining whether a departure is warranted.

U.S.S.G. § 5H1.1. A defendant's physical condition may also be relevant. U.S.S.G. § 5H1.4. As

described in the PSR, Mr. Sweeney is a 61 year old man suffering from a variety of both physical

and mental health diagnoses. He is disabled from the military and receives a VA disability

payment each month. He takes medication regularly for his ailments, and is still suffering from

the pain related to not having any teeth in his mouth. Studies have shown that Bureau of Prisons

(BOP) institutions "lack appropriate staffing levels to address the needs of an aging inmate

population, and provide limited training for this purpose." U.S. DEPARTMENT OF JUSTICE:

OFFICE OF THE INSPECTOR GENERAL, THE IMPACT OF AN AGING INMATE POPULATION

ON THE FEDERAL BUREAU OF PRISONS (May 2015), *available at*

http://oig.justice.gov/reports/2015/e1505.pdf.

Facilities can also expect problems managing populations with elderly inmates, including

"vulnerability to abuse and predation, difficulty in establishing social relationships with younger

inmates, need for special physical accommodations in a relatively inflexible physical

environment." B. Jayne Anno, et al, *Correctional Health Care: Addressing the Needs of Elderly,*

*Chronically Ill, and Terminally Ill Inmates*, NATIONAL INSTITUTION OF CORRECTIONS,

February 2004, pp. 9-10.  Already these issues have come up while Mr. Sweeney has been

incarcerated in the Delaware County Correctional Facility. He reports being hit over the head with a chair by another inmate because he sat in the wrong seat for lunch. He has been sanctioned for not conforming to various jail rules such as having a top bunk pillow on a bottom bunk, asking for soap, and having an extra sugar packet. His inexperience with incarceration and his age have made it difficult for him to assimilate into the general population. This problem will not be alleviated with more jail time.

An audit of the BOP by the Office of the Inspector General found systemic deficiencies in the health services provided by the BOP. At a number of institutions, the BOP "did not provide required medical services to inmates," including failing to monitor medication side effects, not treating chronic conditions, and failing to meet performance target levels for the treatment of serious conditions. U.S. DEPARTMENT OF JUSTICE: OFFICE OF THE INSPECTOR GENERAL AUDIT DIVISION, THE FEDERAL BUREAU OF PRISON'S EFFORTS TO MANAGE INMATE HEALTH CARE (February 2008), *available at* www.justice.gov/oig/reports/BOP/a0808/final.pdf. As noted in the PSR, Mr. Sweeney suffers from a cornucopia of health issues, for which he is prescribed multiple medications. Most of these health issues have been chronic and long-lasting, for which medication is required to keep under control. The BOP's demonstrated issues in providing adequate medical care for chronic conditions are a cause of concern for someone like Mr. Sweeney who depends on reliable medical care to keep these conditions from progressing.

Mr. Sweeney's age has caused issues with his assimilation into jail life; making the time he has served quite different from someone who is younger. His health problems will not be solved by more jail time, nor is it likely he will receive timely medical attention in a BOP facility. His age and health issues warrant a downward departure in his case.

**CONCLUSION**

A below-guideline departure to account for Mr. Sweeney's age and health issues is appropriate in this case. A below-guideline variance to account for his statistically low likelihood of recidivism is also appropriate in this case. Mr. Sweeney's guidelines are 10-16 months. He has served 8 months. A sentence of time-served is still a significant sentence for Mr. Sweeney who has not been incarcerated before, and has demonstrated an inability to adjust to life in the general population of a jail facility due to his age and health issues. Mr. Sweeney has spent eight rough months in the Delaware County Correctional Facility, almost three hours from his home. He does not have many family members or friends to keep in touch with, and this has been a rather isolating experience for him.

He has acknowledged his wrongdoing, and expressed his regret for his actions. Further jail time will not accomplish much, either in the way of rehabilitation or deterrence. Mr. Sweeney's eight months in jail have been the biggest deterrent that he ever could have imagined. His time in jail has not been easy, and further jail time may cause more issues for his mental and physical health.

Because he poses a low risk of recidivism, and because his age and health issues make him part of a vulnerable population that BOP facilities may not be adequately equipped to handle, a below-guideline sentence in this case is appropriate. Taking into account his tragic past, his demonstrated remorse, and the significance of the time he has already served, a sentence of time-served with no supervision to follow is sufficient, but not greater than necessary to comply with the provisions of the Sentencing Reform Act.

DATED: October 17, 2019

Respectfully submitted,

Lisa Peebles
Federal Public Defender

By: Gabrielle DiBella
/s/ *Gabrielle DiBella*
Assistant Federal Public Defender
Bar Roll No. 700576
Office of the Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, NY 13202
(315) 701-0080

cc:     Michael Gadarian, AUSA, by ECF
        Mark Sweeney, Jr., by mail