```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES,
                                        Plaintiff,

-v-                                     5:19-CR-253

MARK W. SWEENEY,

                                        Defendant.
------------------------------------------------------------x
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE DAVID N. HURD**
November 7, 2019
10 Broad Street, Utica, New York


For the Plaintiff:

    OFFICE OF THE UNITED STATES ATTORNEY
    100 South State Street
    P.O. Box 7198
    Syracuse, New York 13261
    BY:  **MICHAEL F. PERRY, ESQ.**

For the Defendant:

    OFFICE OF THE FEDERAL PUBIC DEFENDER
    4 Clinton Square
    3rd Floor
    Syracuse, New York 13202
    BY:  **GABRIELLE DIBELLA, ESQ.**


*Hannah F. Cavanaugh, RPR, CRR, CSR, NYACR, NYRCR*
*Official United States Court Reporter*
*10 Broad Street*
*Utica, New York 13501*
*(315) 266-1176*

1              (Open court.  Time noted:  12:09 p.m.)
2              THE COURTROOM DEPUTY:  United States v. Mark W.
3    Sweeney, 19-CR-253.  Attorneys, please note your appearances for
4    the record.
5              MR. PERRY:  Good afternoon, your Honor.  Michael
6    Perry standing in for AUSA Mike Gadarian.
7              THE COURT:  Good afternoon.
8              MS. DIBELLA:  Good afternoon, Gabrielle DiBella on
9    behalf of Mr. Sweeney who's also present.  Also present in the
10   courtroom today are Mr. Sweeney's best friend, Michael, and his
11   daughter.
12             THE COURT:  Is there any reason why we should not now
13   proceed with sentencing, counselors?
14             MR. PERRY:  No, your Honor.
15             MS. DIBELLA:  No, your Honor.
16             THE COURT:  Stand up, Mr. Sweeney.
17             Okay.  Ms. DiBella, you've had an opportunity to
18   review the Presentence Report with the attachments and the
19   amendments with your client?
20             MS. DIBELLA:  Yes, I have.
21             THE COURT:  Mr. Sweeney, you've gone over this
22   Presentence Report with your lawyer, have you?
23             THE DEFENDANT:  Yes, sir.
24             THE COURT:  Ms. DiBella, do you have any objections
25   to the factual accuracy of the Presentence Report?

1           THE DEFENDANT:  No, your Honor.  The objection that I
2    had related to a -- an appendix.
3           THE COURT:  Okay.  Mr. Sweeney, are there any facts
4    in that report that you went over with your lawyer that you
5    object to?
6           MS. DIBELLA:  There was a question about a court
7    record from when he was 17 that he was unsure of the degree of
8    the possession that was charged, he believed it to be a lesser
9    degree.  From what I reviewed, it looked like the PSR has it
10   correctly recorded, but Mr. Sweeney's recollections are
11   different.
12          THE COURT:  Any other points, Mr. Sweeney, regarding
13   the facts?
14          THE DEFENDANT:  No, sir.  Everything else is perfect.
15          THE COURT:  Does the government have any objections
16   to the factual accuracy of the report?
17          MR. PERRY:  No, your Honor.
18          THE COURT:  I adopt the factual statements contained
19   in the Presentence Report.  The Presentence Report will be made
20   a part of the record and the clerk is ordered to place the
21   report under seal.
22          There is no plea agreement, correct, counselors?
23          MS. DIBELLA:  That's correct.
24          THE COURT:  Is that correct, Mr. Perry?
25          MR. PERRY:  Yes, your Honor, I'm sorry.

1            THE COURT:  In addition to the Presentence Report
2    with the addendum, I have also reviewed the government's
3    sentencing memorandum, of course, the indictment, the sentencing
4    memorandum of the defense with enclosures.
5            Is there any other additional written materials that
6    I should review before we proceed further, counselors?
7            MR. PERRY:  No, your Honor.
8            MS. DIBELLA:  No, your Honor.
9            THE COURT:  The probation department has recommended
10   a base offense level at paragraph 17 of 12, which results in an
11   adjusted offense level at paragraph 22 of 12, 2 levels off at
12   paragraph 24 for acceptance of responsibility, resulting in a
13   total offense level of 10, a criminal history category I, and an
14   advisory guideline range of 6 to 12 months.
15           Does either counselor have any objections to the
16   probation officer's application of the sentencing guidelines?
17           MR. PERRY:  No, your Honor.
18           MS. DIBELLA:  No, your Honor.
19           THE COURT:  Therefore, I find that the total offense
20   level is 10, criminal history category I, and the advisory
21   guideline range of 6 to 12 months.
22           Ms. DiBella, is there any motion for a non-guideline
23   sentence?
24           MS. DIBELLA:  Your Honor, when I first wrote my
25   sentencing memo, I had typed the guidelines incorrectly.  They

1   are 6 to 12.  Mr. Sweeney has been in custody for eight months,
2   so the sentence that we are asking for is within the guideline
3   range.
4            THE COURT:  So noted.
5            Mr. Perry, does the government have any motions?
6            MR. PERRY:  No, your Honor.
7            THE COURT:  Okay.  Mr. Perry, any victims wish to be
8   heard?
9            MR. PERRY:  Not that I know of, your Honor.
10           THE COURT:  Ms. DiBella, do any family or friends
11  wish to be heard?
12           MS. DIBELLA:  Yes, your Honor.  Mr. Sweeney's best
13  friend, Michael Cali, is here.
14           THE COURT:  Mr. Cali, stand up and go over to the
15  podium, identify yourself, and say what you wish.
16           You may be seated.
17           THE COURTROOM DEPUTY:  Mr. Cali, sir, would you
18  please state your full name and spell your last name for the
19  record?
20           MR. CALI:  Michael A. Cali, C-A-L-I.
21           THE COURT:  Go ahead and say what you wish.
22           MR. CALI:  Okay.  Mark and I have been the best of
23  friends for probably 12 plus years, although this event happened
24  while I was in the hospital having open heart surgery.  Mark
25  came in to see me and prior to this, we had a number of

1  discussions as to what would happen if I was to die.  Mark's a
2  very, very sensitive person and his comment was he didn't know
3  what he would do.
4          He came to the hospital to see me, I don't remember
5  it, I have a 10-day period of time where I don't even remember
6  what I was doing, and Mark left the hospital and apparently
7  right after this is when all of these things took place.  I had
8  no idea what it was or anything else, all I can say is he is one
9  of the kindest and gentlest people you ever wanted to meet.  He
10 would give you the shirt off his back and if he didn't have one
11 on, he'd buy one for you and give it to you.  I can't say enough
12 about him and, of course, I'm obviously prejudiced because he is
13 one of my very, very best friends.
14         Thank you.
15         THE COURT:  Thank you.
16         Ms. DiBella, do you wish to be heard?
17         MS. DIBELLA:  Just briefly, your Honor.  What Mark
18 Sweeney did back in February was wrong.  It was criminal, it was
19 concerning, and it was troubling, but it was also human.  As we
20 just heard from Mr. Cali, the series of events started because
21 Mr. Cali was having open heart surgery and there was some debate
22 about what the outcomes might be.  And so this is kind of the
23 first in a series of events that led into this downward spiral
24 that was evidenced by this phone call to the VA crisis line.
25         So he has this deep concern for what's going to

1  happen to his best friend.  At this time, he's also dealing with
2  his own mental health issues, his own physical health issues.
3  As I outlined in my sentencing memo, a lot of the comments that
4  he made on this phone call, they are certainly criminal, but the
5  remaining comments cannot be ignored.  As I mentioned in my
6  memo, the dispatcher asks, "What you do you want?"  Mr. Sweeney
7  says, "I want to be treated like a human."  That's his goal.
8           This is someone who lost his parents before he turned
9  25.  He doesn't have contact with his siblings.  There was
10 strife because he had to raise his younger brother when his
11 parents passed away.  He doesn't have a lot of people in his
12 life to turn to.  His best friend was in the hospital, he was
13 unsure of what the outcome was going to be, he really didn't
14 have anyone else to turn to, so he called the VA crisis line,
15 and this is, really, the peak of his frustration and his
16 exasperation.
17          And he'll admit, he crossed a line.  He said a lot of
18 things that he should not have said.  But, again, to put this
19 call in context, it truly is someone expressing frustration at
20 the VA and with their medical care.  Mr. Sweeney spent $54,000
21 on dental implants.  As he sits here today, he has zero teeth.
22 All that's in his mouth are the posts from the implants.  He had
23 many issues with the dentist who placed the implants and the
24 dentist who told him that the implants all had to come out.
25 These were all single tooth implants for an entire mouth.

1    Mr. Sweeney overheard some conversations between the
2    dentist and his dental assistant that led him to believe that
3    these procedures were being done so that the dentist could make
4    money.  He believed that the dentist was putting in these single
5    implants rather than a bridge or a denture to make money off of
6    Mr. Sweeney.  And the dentist told Mr. Sweeney that one implant
7    was failing so they all had to come out.  I'm not a dentist, I
8    don't know the truth of that statement, but what Mr. Sweeney
9    took away from that was that this is someone who was trying to
10   scam him.  This is someone who lives on a limited income, who
11   doesn't have a support system, and he felt like he was being
12   taken advantage of, and so that leads to his frustration.
13       He also has a lot of ongoing pain issues that are
14   documented in about 3,000 pages of his VA records.  He was
15   prescribed morphine for a period of over 15 years.  He was
16   prescribed a very heavy narcotic drug for 15 years and then he
17   was told one day, that's it, no more, we've got to figure out
18   another plan.  This is something that would jar most people to
19   suddenly hear that there's a new pain management technique that
20   they're going to have to do, but it was even more jarring for
21   someone who, again, doesn't have a very large support system and
22   already felt like he was being scammed by another medical
23   provider.
24       So, truly, Mark Sweeney is someone who, on this day,
25   was at his breaking point.  He had had enough.  And so he called

1   the crisis line because he was in a crisis and he told the
2   dispatcher this is what's going on, I'm not getting the care
3   that I need, I'm not getting the level of care that I think I
4   deserve, I have all these issues with my teeth and pain, I'm not
5   being taken seriously.  He fully admits that the rest of the
6   conversation was wrong.  He knows that and he's incredibly
7   remorseful for that.  It is regrettable that some doctor out
8   there feels unsafe at work.
9            However, Mr. Sweeney has spent the past eight months
10  in custody reflecting on that and he has truly learned his
11  lesson.  As I outlined in my sentencing memo, these eight months
12  have been very hard.  He's never been to jail before.  He
13  doesn't know what it's like.  He's significantly older than the
14  rest of the jail population.  Because of this, he's an easy
15  target.  So when things happen to Mr. Sweeney in that facility,
16  it's understandably easier for him to be moved out of the jail
17  cell because he's one person.  It's easier for him to be taken
18  into segregation than it is to deal with the multiple inmates
19  that are creating some issues with him.  And so he has faced a
20  lot of tension and a lot of conflict in the jail facility.
21           I did make note in my sentencing memo that he has
22  been sanctioned several times while he's been in Delaware
23  County, and a few of these were from incidents with guards and
24  corrections officers.  The majority of them were because he
25  asked for soap, he had a top bunk pillow in a bottom bunk, he

1  had his blanket over his head, and one time, I believe, he
2  didn't want to come out for dinner.  So these are the things
3  that are going on in his life.  His life is that regulated that
4  he's being sanctioned because he asked for soap.
5           So he has learned a really hard lesson these past
6  eight months.  He has spent every single day these past eight
7  months reflecting on what he did.  And this jail time is
8  incredibly more significant for him than it would be for someone
9  else who's done jail time before.  Because of the significance
10 of this and because of the fact that he really -- he stayed out
11 of trouble for quite some time.  I really do believe that he's
12 learned his lesson and that a sentence of time served with no
13 supervision is sufficient, but not greater than necessary, to
14 achieve the purposes of the Sentencing Reform Act, so we would
15 ask the judge -- we would ask your Honor to impose that.
16          Thank you.
17          THE COURT:  Thank you.
18          Mr. Sweeney, do you wish to say anything to me?  If
19 you do, stand up and say whatever you wish.
20          THE DEFENDANT:  Just that --
21          THE COURT:  Move the mic close and speak up.
22          THE DEFENDANT:  As far as any -- as far as anything
23 while I was in jail, it was pretty much right because I was
24 green and didn't know anything.  And at Delaware County, there
25 are correct things that are -- you wouldn't even think are

1  punishable or, like, a write-up or -- just about anything -- if
2  you looked cross-eyed at someone, you could get written up if
3  the COs -- officers so decide.
4          But, again, I would also say that after eight
5  months on top of -- like, two months, you're pretty green.
6  After eight months, I even did a write up that -- myself that
7  pretty much 99 percent of the officers are incredibility
8  wonderful there.  There's only one that I think needs a little
9  training.  But aside from that, they're an incredible group of
10 good officers that are doing a job that looks easy because
11 they're not lifting things or in a factory, but it's not an easy
12 job.  It's a -- because I did a job similar to that.  I was
13 therapy aide at Hutchings for 13 years.  It's very similar.  You
14 know, people are locked up in a mental hospital.  I guess all
15 I'm saying there is for those officers, they're -- it's an
16 incredible group of men.
17         As far as me -- what was I going to -- yeah, I mean,
18 I don't have a real criminal history.  I was on the phone -- I
19 didn't call the VA Hospital.  There's a VA Hospital in Syracuse.
20 I know the number, I didn't call that, I called the help line.
21 I was on the phone to a help line and lost my temper, just -- I
22 don't even know how it happened.  I just -- it started out a
23 normal call.  If you know what I'm trying to say, it was a help
24 line.  I didn't call the hospital to threaten -- so I'm good.
25 That's all I want to say there.

1           Of course I regret it.  I was in jail and -- and,
2  yeah, I'm not -- I don't have a lot of criminal history, I just
3  made a mistake.  I'm not -- I guess that's about all I have to
4  say.
5           THE COURT:  Okay.  Thank you.  You may be seated.
6           Mr. Perry, does the government wish to be heard?
7           MR. PERRY:  Very briefly, your Honor, if I may.
8           I want to point out in paragraph three of the PSR
9  that it indicates that on May -- excuse me, on April 4th of
10 2019, the defendant smacked another inmate.  And then on
11 May 22nd of 2019, he threatened an inmate by saying, "One day
12 I'm going to slap the shit out of you."  And then on July 29th
13 of 2019, the defendant attempted to instigate a fight by using a
14 racial slur when speaking to another inmate.  These were
15 unobjected to facts in the PSR.  I think that is relevant to
16 your determination, your Honor.
17          A few other things just to point out, you have the
18 government's recommendation from Mr. Gadarian.  Of course, the
19 government's concerned about this conduct.  This was not one or
20 two statements, the defendant went on and on.  You heard from
21 his friend who described him as a loving person who would help
22 others.  Apparently this charity does not extend to people at
23 the VA that he's frustrated with.  He says he wants to be
24 treated like a human.  That is not how he treated them, of
25 course.

1    And, also, your Honor, as the PSR -- the appendices
2    to the PSR made clear, one of the dangers from the type of
3    conduct that the defendant engaged in, and from his specific
4    conduct, is how it effects others.  And a number of people
5    online expressed sympathy with the idea of killing VA employees
6    and there's always a risk of copycats, so this is not a
7    victimless crime, of course.
8    And so I ask your Honor to take all of that into
9    account in sentencing this defendant, but the ultimate
10   recommendation from the government is a guideline sentence with
11   appropriate conditions that hopefully would prevent the
12   defendant from acting on any of these violent tendencies that he
13   has.  Thank you.
14            THE COURT:  Thank you, Mr. Perry.
15            I have considered all of the factors under 3553(a).
16   There are certain, shall we say, positive factors that I must
17   consider, your age, your physical and mental disability.  It's
18   somewhat understandable sometimes that you may get frustrated
19   with dealing with the VA.  This is a common matter.  It may or
20   may not be the fault of the VA, but it's sort of understandable
21   with somebody with your problems.
22            But I don't really believe, Mr. Sweeney, that you
23   realize the seriousness of the criminal activity that you did,
24   threatening to kill people, because we can tell by the
25   victims -- and the VA people always have people who are

1  frustrated, ex-military who know how to use guns and know how to
2  use firearms.  And, obviously, we have three identified victims.
3  It's a very serious crime and I have some doubt -- and counsel
4  has already pointed out that while in custody at Delaware
5  County, you've had three sanctions and everything else where you
6  expressed your frustration and anger and threatening people and
7  punching people.
8            There is a maximum -- I don't think you realize what
9  you did has a maximum penalty of ten years in this matter.  And
10 you are in custody in Delaware County, which you've expressed
11 that the guards there were good to you and good people, and yet
12 you still got sanctions.  So it's very temptable to go above the
13 guidelines in this particular case because I don't really think
14 you realize the seriousness of what you did, but the -- you have
15 served eight plus months under not ideal conditions and we'll
16 put you on supervised release for a period of time.  And if you
17 should violate any of those conditions, you'll be back before me
18 and I will be giving you the maximum prison term for two
19 reasons, to punish you and also to protect the public.
20           So if you ever get in trouble again and come before
21 me, don't look for any sympathy.  Do you understand?
22           THE DEFENDANT:  Yes, sir.
23           THE COURT:  Come forward to be sentenced.
24           Upon your plea of guilty to Count #1 of the
25 information, it is the judgment of the Court that you are hereby

1  sentenced to time served, which is 253 days.  Upon your release
2  from imprisonment, you shall be placed on supervised release for
3  one year.  While on supervised release, you should not commit
4  another federal, state, or local crime.  You shall comply with
5  the standard conditions that have been adopted by this court and
6  comply with the following special conditions, which are related
7  to your offense, your history of alcohol and drug abuse, and
8  your mental health issues.
9         One, you shall not have intentional contact with the
10 three identified victims.  Should you have unintentional contact
11 with these victims at their place of employment, you shall not
12 harass, threaten, follow, or interfere with them, either
13 directly or indirectly, which includes, but is not limited to,
14 written communications; electronic communications; in-person
15 communications; physical contact; or any communications that
16 would likely alarm the victims outside their place of
17 employment.  Should you have contact with these victims outside
18 their place of employment, you shall remove yourself from the
19 location and report it to the probation officer within 24 hours.
20 Understand?
21        THE DEFENDANT:  Yes, sir.  I don't even know who they
22 are, sir.
23        THE COURT:  Number two, you shall participate in a
24 program for substance abuse.  The details will be set forth in
25 the judgment.

1            Three, you should refrain from the use of alcohol and
2    be subject to alcohol testing and treatment while under
3    supervision.
4            And number four, you shall participate in a mental
5    health program.  Again, the details will be set forth in the
6    judgment.
7            You shall also pay to the Clerk of the Court a
8    special assessment of $100, which is due immediately.  You do
9    not have the ability to pay a fine, obviously, and a fine is
10   waived.  You do have a right to appeal this sentence in certain
11   limited circumstances.  Consult with your attorney to determine
12   whether an appeal is warranted.  Any appeal must be filed within
13   14 days of the date the judgment is filed in this case.  There
14   is no waiver of appeal because there is no plea agreement and
15   there are no counts to be dismissed.
16           Did you understand what I said?
17           THE DEFENDANT:  Yes, sir, I believe so.  It was a
18   lot.  It'll be written down for me, right?
19           THE COURT:  Yes, you will get a judgment and you
20   better abide by it.
21           THE DEFENDANT:  Yes.
22           THE COURT:  The probation officer will be checking on
23   you for the next year.
24           THE DEFENDANT:  Yes.
25           THE COURT:  And if you should violate, you'll be

```
 1  before me again --
 2              THE DEFENDANT:  I understand that.
 3              THE COURT:  -- and you'll go back to prison and it
 4  will not be kind to you.
 5              THE DEFENDANT:  Okay.  I understand, sir.
 6              THE COURT:  I was tempted to give you a lot more time
 7  because of your violations and the seriousness of what you did
 8  and my feelings that maybe you really don't understand the
 9  seriousness of what you did, but you've got a good attorney and
10  the U.S. Attorney has not been trying to punish you by pointing
11  out your situation.  I don't want to ever see you again and if I
12  do --
13              THE DEFENDANT:  I understand.
14              THE COURT:  -- it will not be kind.
15              THE DEFENDANT:  I understand what you're saying.  I
16  understand that.
17              THE COURT:  All right.
18              THE DEFENDANT:  I understand those words, sir.
19              THE COURT:  You're released to the custody -- you're
20  remanded to the custody of the United States Marshals in
21  accordance with the terms of the sentence just imposed.
22              Anything further, counselors?
23              MR. PERRY:  No, your Honor.  Thank you.
24              THE COURT:  Anything further?
25              MS. DIBELLA:  No, I have nothing further.
```

1                    THE COURT:  Mr. McBrearty.

2                    THE COURTROOM DEPUTY:  Court stands adjourned.

3               (Time noted:  12:35 p.m.)

HANNAH F. CAVANAUGH, RPR, CSR, NYACR
Official U.S. Court Reporter

```
 1
 2                    CERTIFICATE OF OFFICIAL REPORTER
 3
 4
 5            I, HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR,
 6   NYRCR, Official U.S. Court Reporter, in and for the United
 7   States District Court for the Northern District of New York, DO
 8   HEREBY CERTIFY that pursuant to Section 753, Title 28, United
 9   States Code, that the foregoing is a true and correct transcript
10   of the stenographically reported proceedings held in the
11   above-entitled matter and that the transcript page format is in
12   conformance with the regulations of the Judicial Conference of
13   the United States.
14
15            Dated this 2nd day of September, 2020.
16
17         x Hannah F. Cavanaugh
18            HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR
19            Official U.S. Court Reporter
20
21
22
23
24
25
```